FILED

2019 Feb-01  PM 03:04
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **TAMMY SHAVERS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE** |
| | ) | **NUMBER:** _____ |
| **AETNA LIFE INSURANCE** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

Comes now the Plaintiff, Tammy Shavers, and hereby files her Complaint against Aetna Life Insurance Company.

## PARTIES

1. The Plaintiff, Tammy Shavers ("Ms. Shavers") was a participant in an ERISA-governed plan and was denied long-term disability benefits due to her under the terms of the plan.

2. Defendant, Aetna Life Insurance Company ("Aetna"), is the sponsor for the group Long-Term Disability Policy No. GP-062399 ("the Plan") issued to UBS Financial Services, Inc., that has improperly denied owed benefits to Ms. Shavers. Upon information and belief, Aetna is a foreign corporation doing business in the State of Alabama, specifically within this district.

## JURISDICTION AND VENUE

3.     This action arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001, et seq.  Plaintiff asserts claims for long-term disability benefits, enforcement of ERISA rights and statutory violates of ERISA under 29 U.S.C. §1132.  This Court has subject matter jurisdiction under ERISA without respect to the amount in controversy or the citizenship of the parties.  29 U.S.C. §1132(a),(e)(1) and (f) and 28 U.S.C. §1131.  Venue is proper in this district pursuant to 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b).

## INTRODUCTION

4.     The traditionally held purpose of the ERISA statute is "to promote the interest of employees and their beneficiaries in employee benefit plans."  *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 90 (1983).  Ms. Shavers, as an employee insured for disability, was supposed to be treated as a beneficiary by the Defendant as statutory fiduciary.   Instead, the Defendant has victimized Ms. Shavers by engaging in utterly reprehensible claim handling procedures.  The shortcomings of ERISA as it relates to claims for "welfare" benefits have been exploited by the Defendant to avoid paying Ms. Shavers' valid claim that would otherwise be payable under state insurance law.  With no jury trial and no punitive damages, despite the unscrupulous conduct of the Defendants, Ms. Shavers' "relief" is limited to the amount of benefits to which she was clearly entitled in the first place,

with merely the possibility of interest and attorney's fees.  As described in more detail below, the Defendant has clearly engaged in bad faith claim handling and Ms. Shavers, at minimum, is patently entitled all relief that ERISA provides.

## STATEMENT OF FACTS

5.     Ms. Shavers is an insured under the group Long-Term Disability Policy No. GP-062399 ("the Plan") issued to UBS Financial Services, Inc. ("UBS"). The policy provides insureds, like Ms. Shavers, long-term disability benefits. (*See* Exhibit "A" Aetna LTD Policy).

6.     Ms. Shavers worked at UBS as a Brokerage Clerk until her disabilities, primarily Meniere's Disease and fibromyalgia, forced her to stop working on or around September 12, 2016.

7.     Ms. Shavers' medical disabilities include Meniere's disease with 40% hearing loss in her right ear, fibromyalgia, and neuropathy. As a result, Ms. Shavers suffers from chronic migraines, dizziness, vertigo, anxiety, and depression. Ms. Shavers also suffers a multitude of side effects from her necessary medications, such as fatigue and nausea. All of these conditions, symptoms, and side effects render Ms. Shavers unable to work in any capacity.

8.     Ms. Shavers was originally out of work on or around September 12, 2016, due constant headaches, vertigo, and mental fog. In an Attending Provider Statement, Ms. Shavers' primary physician, Dr. Benjamin Hill, stated that Ms.

Shavers' return to work date and time frame for improvements was "unknown" due to her symptoms, and would require new medications, physical therapy, and further testing. (*See* Attending Provider Statement, dated September 15, 2016, attached hereto as Exhibit "B").

9.      Several days later, Ms. Shaver met with her otolaryngologist, Dr. Michael Speyer. During this visit, Ms. Shavers complained that she was "still experiencing vertigo with daily migraines that make it impossible to function." Ms. Shavers also complained of side effects from her current medications, such as nausea and drowsiness. (*See* St. Thomas Progress Notes, dated September 21, 2016, attached hereto as Exhibit "C").

10.     Based on the medical evidence presented, Aetna approved Ms. Shavers for short term disability by letter dated September 26, 2016. (*See* Aetna STD Approval Letter, dated September 26, 2016, attached hereto as Exhibit "D").

11.     Unfortunately, despite her approval and ongoing treatments, Ms. Shavers' condition failed to improve. In November of 2016, Ms. Shavers returned to Dr. Hill, who noted that "[p]hysical therapy was no help." Dr. Hill also noted that "[p]atient states that she has profound fatigue and also complains of pain in her feet knees and neck", as well as "swelling in her fingers and ankles." (*See* St. Thomas Progress Notes, dated November 17, 2016, attached hereto as Exhibit "E").

12.     In December of 2016, Ms. Shavers returned to Dr. Speyer, and stated that her symptoms of vertigo and fatigue were "incapacitating" and that Ms. Shavers was "unable to work." (*See* St. Thomas Progress Notes, dated December 6, 2016, attached hereto as Exhibit "F").

13.     As requested by Aetna, Dr. Hill completed another Attending Provider Statement to describe her continued disability. Once again, when Dr. Hill was asked whether Ms. Shavers was expected to make a full recovery and could return to work, Dr. Hill wrote "unknown". (*See* Attending Provider Statement, dated January 25, 2017, attached hereto as Exhibit "G").

14.     Throughout the following year, Ms. Shavers continued to suffer from the debilitating symptoms of her many conditions. In February of 2017, Ms. Shavers returned to Dr. Hill for a follow-up appointment. During this visit, Ms. Shavers continued her complaints of fatigue, weakness, difficulty concentrating, and "trouble with memory." As a result, Dr. Hill noted that Ms. Shavers "has had a depressed mood, decreased motivation, anhedonia; most days notes sluggishness/psychomotor retardation." (*See* St. Thomas Progress Notes, dated February 7, 2017, attached hereto as Exhibit "H").

15.     Despite Aetna paying Ms. Shavers' entire short-term disability claim and awarding her benefits for the maximum short-term disability period, alongside the plethora of medical evidence that Ms. Shavers remained disabled and most

certainly qualified for long-term disability, Aetna informed Ms. Shavers by letter dated February 21, 2017, that she no longer met the policy definition of disabled and therefore no future benefits were payable to her. (*See* Aetna Denial Letter, dated February 21, 2017, attached hereto as Exhibit "I").

16.     Aetna primarily justified its wrongful denial of benefits based off the opinions of a paid medical reviewer, who has never even met Ms. Shavers. (*See* Exhibit "I").

17.     The "Board Certified Physician", who Aetna does not indicate by name in its denial letter, audaciously opined that Ms. Shavers lacked the physical impairment that would prevent her from performing *any* activity. The physician gave two main reasons for his opinion, all of which referenced criteria that Ms. Shavers was never required to meet under the Aetna policy. (*See* Exhibit "I").

18.     First, the physician stated that "[t]he medical information provided does not demonstrate an intensity or persistency such as a headache log which details the timing and response to treatment." Intensity, persistency, or a headache log to document her headaches were never criteria Ms. Shavers had to prove under the Aetna policy definition of disabled. (*See* Exhibit "I").

19.     Second, the physician stated that "It is not described in the available records that [Ms. Shavers] appear[ed] to be incapacitated by pain at the time of [her] office visits", which is yet again criteria that Ms. Shavers was never required

to meet under her Aetna policy. (*See* Exhibit "I").

20. Moreover, the physician's assertion completely disregard the likelihood that Ms. Shavers pre-medicated and had assistance prior to and during her visits. (*See* Exhibit "I").

21. Just one month after her wrongful denial of benefits, Ms. Shavers visited with Dr. Hill and complained of continued vertigo, which notably affected her ability to drive and her overall concentration. Dr. Hill also noted that Ms. Shavers suffered from "40% hearing loss in her right ear, and some in left ear", and that her current medications caused drowsiness and only furthered her loss of concentration. (*See* St. Thomas Progress Notes, dated March 27, 2017, attached hereto as Exhibit "J").

22. Perhaps most importantly, however, Dr. Hill performed a disability evaluation for Ms. Shavers during her March 21, 2017 visit. Dr. Hill opined that Ms. Shavers "is unable to work due to Meniere's disease which causes intractable dizziness and nausea." Dr. Hill further stated that Ms. Shavers' "flairs are unpredictable, but occurring frequently", and her conditions affect "her ability to concentrate at work to avoid error/mistakes." Ultimately, Dr. Hill stated that "[h]er condition appears chronic and limits her ability to work as a client resolution specialist." (*See* Exhibit "J").

23. One month later in April of 2017, Ms. Shavers met with Ms. Lauren

Baker, PA, to discuss her conditions. Ms. Shavers stated that she is "fatigued all the time", experienced dizziness daily, and had intense vertigo every two weeks. Ms. Shavers also stated that she was having difficulty remembering words. (*See* Heritage Medical Progress Notes, dated April 18, 2017, attached hereto as Exhibit "K").

24.    In May of 2017, Ms. Shavers began documenting the severity of her migraines and Meniere's disease in a pain diary. On May 24, 2017, Ms. Shavers noted that she suffered from "severe Meniere's symptoms" and the very next day described a migraine as "agonizing", "exhausting", and caused pain to radiate down her neck. (*See* Pain Diary, attached hereto as Exhibit "L").

25.    Later in July of 2017, Ms. Shavers met with Ms. Baker for another follow-up appointment. Once again, Ms. Shavers continued her complaints of vertigo, which varied in duration from twenty minutes to an hour at a time. She also complained that she was "still having dizzy spells" and that her medications caused tiredness. (*See* Encounter Notes, dated July 13, 2017, attached hereto as Exhibit "M").

26.    Due to the overwhelming evidence that Ms. Shavers remained disabled and her conditions failed to improve, Ms. Shavers appealed her wrongful termination of benefits by letter dated August 18, 2017. Along with her appeal, Ms. Shavers included updated medical records, her pain diary, and a declaration. (*See*

Plaintiff's Appeal Letter, dated August 18, 2017, attached hereto as Exhibit "N").

27.     Despite providing proof of her disabilities both before her termination of benefits and throughout the appeals process, Aetna issued its final denial by letter dated November 1, 2017.  (*See* Aetna Final Denial Letter, dated November 1, 2017, attached hereto as Exhibit "O").

28.     The final denial letter, like the previous letters, improperly found that Ms. Shavers did not meet the Policy definition of disabled.  Aetna primarily based its denial off of social media and video surveillances. (*See* Exhibit "O").

29.     The social media and video surveillances purported to show tasks that Aetna determined should disqualify Ms. Shavers for benefits. These tasks include cooking, supervising her grandchildren, hosting parties and visiting a drive-thru restaurant. (*See* Exhibit 'O"; *See* Surveillance Report, dated September 28, 2017, attached hereto as Exhibit "P").

30.     Aetna's surveillance footage in particular completely disregards the fact that Ms. Shavers likely pre-medicated during these days, masked her symptoms, or simply had a better day. Nearly all of the surveillance is consistent with her intermittent, sporadic, and unpredictable complaints of pain, vertigo, and fatigue. (*See* Exhibit "O"; *See* Exhibit "P").

31.   Ultimately, Aetna's denial letters are riddled with attempts to "cherry-pick" the record for evidence that supports its termination and give little or no

weight the plethora of evidence that supports Ms. Shavers' disability.  (*See* Exhibit "O").

32.    As of this date, Ms. Shavers has been denied benefits rightfully owed to her under the Plan.  Defendant's decision to terminate benefits under her long-term disability policy was grossly wrong, without basis, and contrary to the evidence.

33.    Ms. Shavers has met and continues to meet the Plan's definition of disabled.

34.    The Defendant did not establish and maintain a reasonable claim procedure or provide a full and fair review of Ms. Shavers' claim as required by ERISA.  Instead, Defendant acted in its own pecuniary interests and violated ERISA by conduct including but not limited to the following: reviewing the claim in a manner calculated to reach the desired result of denying benefits; failing to properly consider and credit the medical opinions of Ms. Shavers' medical providers; and failing to credit Ms. Shavers well-documented side effects from her necessary medications.

35.    Upon information and belief, Defendants evaluated and paid all claims under the LTD Plan at issue, creating an inherent conflict of interest.

36.    Upon information and belief, the Plan does not grant discretionary authority to determine eligibility for benefits to Defendants or to any other entity

who may have adjudicated Ms. Shavers' claim. Therefore, the Court should review the Plaintiff's claim for benefits under a *de novo* standard. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). In the alternative, the denial of Ms. Shavers' benefits constitutes an abuse of discretion.

37.    Ms. Shavers has exhausted any applicable administrative review procedures and Defendant's refusal to pay benefits is erroneous, unreasonable, and has caused tremendous financial hardship on Plaintiff.

## DEFENDANT'S WRONGFUL AND UNREASONABLE CONDUCT

### A. Defendant's Determination that Plaintiff does not Meet the Definition of Disability as Stated in the Policy was both Erroneous and Unreasonable.

38.    According to Defendant's denial letter, disability is defined under the policy, in part:

> **Test of Disability**
> You meet the test of disability on any day that:
> - You cannot perform the material duties of your own occupation solely because of an illness, injury, or disabling pregnancy-related condition; and
> - Your earnings are 80% or less of your adjusted predisability earnings:

The policy further states, in part:

You will no longer be considered as disabled nor eligible for long term monthly benefits when the first of the following occurs:
- The date you are no longer under the regular care of a physician.

11

- The date you fail to provide proof that you meet the LTD test of disability.

(*See* Exhibit "A").

39.     According to Aetna, Ms. Shavers' short term disability benefits were approved and paid throughout her policy's entire period from September 26, 2016 through March 12, 2017 and yet denied Ms. Shavers LTD benefits on March 21, 2017 due to a lack of medical evidence to support her inability to perform the material duties of her own occupation.   (*See* Exhibit "O").

40.     Ms. Shavers' condition did not improve, her physicians did not release her to work, and the policy definition of disability did not change. There is no reasonable rationale as to why Aetna determined that Ms. Shavers qualified for short term benefits and yet was denied long term benefits based on the same criteria as before. Moreover, the medical evidence presented to Aetna for long-term benefits only showed that Ms. Shavers' conditions worsened.

41.     Accordingly, Defendant's contention that Ms. Shavers failed to prove that she was disabled under the LTD Plan must be rejected as Aetna's decision to deny Plaintiff's benefits necessarily imposed a standard that was not required by the LTD Plan's provisions.  *See Soucy v. First UNUM Life Ins. Comp.*, 2011 U.S. Dist. LEXIS 27938*89-90.

**B.     Defendant's Decision to Terminate LTD Benefits was not Supported by Substantial Evidence.**

42.     In the review of Ms. Shavers' claim, Defendant only retained paid medical reviewers to review her file.

    1.     <u>Defendant's Reliance on Paper-Reviews to Deny Benefits was Arbitrary and Capricious.</u>

43.     Ms. Shavers' claim file is replete with medical records from her treating physicians that extensively detailed her limitations. Ms. Shaver physicians' assessments, treatments and medications they prescribed and administered, demonstrate that Ms. Shavers' diagnosed conditions and symptoms are extremely debilitating.

44.     Ms. Shavers' treating physicians, who have no stake in the outcome of the case, reached the opinion that she was disabled based on their numerous examinations of her. Aetna's hired medical reviewers, on the other hand, did not examine Ms. Shavers.  The conclusion that Ms. Shavers was not disabled was based merely on the paid physician's review of the plaintiff's records. *See Hoover v. Provident Life and Accident Ins. Co.*, 290 F.3d 801,809 (6th Cir. 2002) (finding that evidence in the administrative record did not support the revocation of benefits because the only doctors that disagreed with the treating physicians were non-examining consultants hired by the insurance company). *See Kalish v. Liberty Mutual*, 419 F.3d 501, 508 (6th Cir. 2005) (whether a doctor has physically examined the claimant is indeed one factor that we may consider in determining

whether a plan administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its consulting physician).

45.     In weighing the opinions of Ms. Shavers' physicians against those of the independent reviewers retained by the Defendant, the Court should consider the following factors: (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) other relevant factors. *See Karanda v. Connecticut Gen. Life Ins. Co., et al.,* 158 F. Supp. 2d 192, 205 and n.8 (D. Conn. 2000) (citing *Durr v. Metropolitan Life Ins. Co.,* 15 F. Supp. 2d 205, 213 (D. Conn. 1998)).   Even if the Defendant could somehow overcome the inadequacy paid reviewers findings, the findings would still stand alone as the only such findings in the Administrative Record suggesting that Ms. Shavers might somehow have been able to return to work, and would remain overwhelmed by numerous treatment records suggesting the opposite. Accordingly, no reasonable mind could accept as adequate the evidence upon which the Defendant relied to support the decision to terminate Ms. Shavers' benefits.

46.     Although a court may not automatically accord special deference to a treating physician's opinion when reviewing a disputed ERISA claim, *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 825, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003), a court also "may not arbitrarily refuse to credit a claimant's reliable

evidence, including the opinions of a treating physician." *Id.* at 834.  The Supreme Court has held that plan administrators are not required to accord special deference to the opinions of treating physicians. *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 825, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003). Moreover, courts have recognized that "treating physicians, as a rule, have a greater opportunity than consultants to know and observe the patient as an individual." *Id.* at 832. While *Nord* makes it clear that this court is not required to adopt a per se rule to treat physicians' opinions with more weight, "[c]ommon sense and a stream of legal precedent suggest, however, factual determinations of a treating physician are objectively more reliable." *Burt v. Metropolitan Life Insurance Co.,* No. 1:04-CV-2376-BBM, 2005 U.S. Dist. LEXIS 22810, at *33 (N.D. Ga. Sept. 16, 2005) (emphasis in original); *See also Finazzi,* 327 F. Supp. 2d at 795-96.

2. <u>Defendant's Failure to Properly Credit Ms. Shavers' Well-Documented Subjective Complaints Was Arbitrary and Capricious.</u>

47.     Admittedly, Ms. Shavers' primary disabling impairments have some subjective components; however, they have been diagnosed by her treating physicians based on her medical history, physical examinations, and observations. The Defendant far exceeds its discretion to ascertain a claimant's credibility by characterizing the bulk of Ms. Shavers' treatment records as somehow flowing from her own subjective reports and thus equally subject to its rejection as non-credible.

48.     In *Quigley v. UNUM Life Ins. Co. of America,* 340 F. Supp. 2d 215, 224 (D.Conn. 2004), the Court held "[w]here the record reveals well-documented complaints of chronic pain, and there is no evidence in the record to contradict the claimant's complaints, the claim administrator, and the court, cannot discredit the claimant's subjective complaints." *Id.* at 224.

49.     An administrator may not exclude a claim for lack of objective medical evidence unless that standard was made "clear, plain and conspicuous enough [in the policy] to negate layman [plaintiff's] objectively reasonable expectations of coverage." *Saltarelli v. Bob Baker Group Medical Trust et al.,* 35 F.3d 382, 387 (9th Cir. 1994); *See also May v. Metro. Life Ins. Co.,* 2004 U.S. Dist. LEXIS 18486, *26 (N.D. Cal. Sept. 9, 2004) ("MetLife abused its discretion by requiring that Plaintiff meet an additional requirement for eligibility beyond those imposed by the Plan.").   As the Ninth Circuit has explained, some impairments are based on symptoms that are "entirely subjective." Defendants may not deny plaintiff's claim because she could not provide objective proof where such proof is not available. *See Duncan v. Continental Cas. Co.,* 1997 U.S. Dist. LEXIS 1582, *15-17 (N.D. Cal. Feb. 10, 1997) (finding an insurer improperly denied the claim of the plaintiff, who had fibromyalgia, due to a lack of "objective medical evidence" to support her disability claim).

50.     The United States Court of Appeals for the Eleventh Circuit, in

*Oliver v. Coca-Cola Co.,* 497 F.3d 1181, 1196-97 (11th Cir. 2007), vacated in part on other grounds, 506 F.3d 1316 (11th Cir. 2007), held that it was arbitrary and capricious for an employer to deny benefits for disabilities involving elements of subjective pain when the claimant provided ample evidence and the administrator never requested any additional kind of evidence. *Oliver,* 497 F.3d at 1196-97.

51.     Here, Ms. Shavers provided both objective and subjective evidence. Her medical records contain well-documented complaints of frequent vertigo, mental fog, excessive fatigue, impaired hearing, and impaired concentration. To the contrary, Aetna completely glossed over the issues surrounding Ms. Shavers' impaired concentration, fatigue, and other limitations.

52.     Even worse, the paid medical reviewers failed to properly credit Ms. Shavers' well-documented side effects from her medications, such as nausea. Failure to consider side effects of medications in determining whether an ERISA claimant is disabled is an example of arbitrary and capricious conduct.   *See Godfrey v. BellSouth Telecommunications, Inc.*, 89 F.3d 755, 759 (11th Cir. 1996).

53.     Clearly, a decision asserting that Ms. Shavers can gainfully work in any occupation given her impairments and side effects from her medications is illogical.  The reviewers simply rejected the opinions of her treating physicians who explained that her impairments are disabling.  Accordingly, Defendant's decision to terminate disability benefits was substantively unreasonable.

3.   Defendants Unreasonably Failed to Properly Consider Ms. Shavers' Non-Exertional Limitations.

54.   As previously stated, Defendant's paid reviewers found Ms. Shavers capable of working in a full-time capacity.  (*See* Exhibit "O").  However, Ms. Shavers' own occupation and any occupation that she would be reasonably suited to perform requires far more than only the ability to perform the physical requirements of the job.  In *Demirovic v. Bldg. Serv. 32 B-J Pension Fund,* 467 F.3d 208, 213-14 (2d Cir. 2006)*,* the Court stated*,* "[A] reasonable interpretation of a claimant's entitlement to payments based on a claim of 'total disability' must consider the claimant's ability to pursue gainful employment in light of all the circumstances." Thus, an administrator must consider whether a beneficiary has "the vocational capacity to perform any type of work . . . that actually exists in the national economy." *Id.* at 213-215.

55.   The Court must also consider non-exertional limitations including (1) intellectual and psychological limitations, including those related to the side effects of prescription medications and pain; (2) limited manual dexterity; and (3) a limited ability to remain seated for an extended period of time. Such non-exertional limitations can be important aspects of vocational capacity. *See Rabuck v. Hartford Life and Accident Ins. Co.,* 522 F. Supp. 2d 844, 876-77 (W.D. Mich. 2007) (holding that failure to consider non-strength limitations of former company president with short-term memory limitations rendered Transferable Skills

18

Analysis "incredible").

56.    It is well documented that Ms. Shavers' concentration is impaired by the side effects from her medications. Moreover, her conditions, symptoms, and side effects cause sensory impairments and frequent nausea that would prevent her from performing any occupation.  Thus, Defendant's failure to properly consider the impacts of Ms. Shavers' non-exertional limitations in their decision was unreasonable.

### C.    Aetna Relied on Inadequate Investigative Surveillance in Denying Ms. Shavers' Claim.

57.    As previously noted, Aetna ordered investigative surveillance of Ms. Shavers to evaluate her ongoing disability.  The surveillance occurred for only two days in September, of which only one day, September 22, 2017, Ms. Shavers performed activities outside of her home. (*See* Surveillance Report, attached hereto as Exhibit "P").

58.    On September 22, 2017, surveillance performed by Claims Bureau, USA, Inc., purported to show Ms. Shavers perform simple, basic errands such as going to a drive-thru restaurant, visiting a drive-thru pharmacy, her church, and eating at a restaurant for no more than 16 minutes. Admittedly, Ms. Shavers also drove her car for 51 minutes when the surveillance ceased. (*See* Exhibit "P").

59.    The case at hand is similar to *Maher v. Massachusetts General Hospital Long Term Disability Plan*, 665 F.3d 289, 294 (1st Cir. 2011), where a

plan administrator's doctor stated that the claimant's activities on surveillance did not match the claimant's reported limitations. The court described the problems with relying on surveillance evidence.

> The first, and most important, rests on the fact that at every stage of Maher's administrative appeal, Liberty and Partners' reviewing doctors emphasized the inconsistency between her self-reported limitations and the surveillance video. It is not apparent to us that any such inconsistency exists. Maher reported that her activity varied based on the extent of her pain, nausea, and opportunity to pre-medicate for activities, but that she generally spent most of her days in bed. In over 90 hours of surveillance, the most damning evidence the MGH Plan can identify is 15 minutes during which Maher carried a bucket or flower pot and 30 minutes during which Maher played with her three-year-old son in the park. On 10 of the 19 days on which surveillance video is available, Maher engaged in no activity. On other days, Maher was shown sitting or standing outside her house with her husband for about 20 minutes. Thus most of the surveillance, far from contradicting Maher's disability, seems to confirm her lifestyle as generally housebound with occasional, limited activity. For the brief periods of slightly more vigorous activity, Maher may have pre-medicated or may have simply been having a "good day"-- either of which would be consistent with her reported limitations.

*Id*.

60.   It appears that Aetna is engaging in similar conduct as the plan administrator in *Maher*. Here, the quality of Aetna's surveillance makes it impossible to determine whether or not Ms. Shavers was in continual pain during these simple, basic errands, and furthermore fails to show how these activities affected her ability to ambulate and concentrate in continuous, subsequent days. Nevertheless, Aetna decided to rely on its one day of grainy surveillance footage

instead of the consistent opinions of Ms. Shavers' treating physicians.  (*See* Exhibit "O"; *See* Exhibit "P").

61.     The surveillance evidence is consistent with Ms. Shavers' diagnosis and her reports of pain and fatigue.  Further, the surveillance does not reveal that Ms. Shavers is capable of engaging in activities that her treating physicians do not believe she can perform. During most of the surveillance, Ms. Shavers was likely experiencing vertigo and pain, but instead of showing it, she chose to mask her symptoms by appearing as normal as possible. Thus, Aetna's surveillance was wholly mischaracterized. In fact, portions of the surveillance footage show Ms. Shavers "bracing her left hand on the vehicle body" while bending as she rearranged items in the trunk of her car as compensation for her pain and vertigo. (*See* Exhibit "P").

62.     Any alleged inconsistencies that Aetna has contrived are minor and do not indicate that Ms. Shavers can perform the physical duties of any occupation.  None of the footage shows that Ms. Shavers performed any single or combination of activities for an eight hour period.  Nothing in the record comes close to establishing that Ms. Shavers' activities could reasonably be equated with the demands of a full-time job, much less her own.  As such, it is abuse of discretion for Aetna and its reviewing physician to use the surveillance as evidence against her claim.  The surveillance video represents a mere snapshot from one day

of surveillance and fails to take into account the impact of any recorded activities on Ms. Shavers' overall condition.

63.    The surveillance investigators are not medical providers and their brief observations are not medical evidence. The surveillance team has no way of knowing Ms. Shavers' exertion needed to complete the tasks such as eating lunch with her family or driving short distances.  In addition, Ms. Shavers' physical limitations are not the only restrictions preventing her return to work in a gainful occupation.

## CAUSES OF ACTION

## COUNT ONE
## ERISA (Claim for Benefits Owed under Plan)

64.    Plaintiff hereby incorporates by reference each and every fact as if it was restated herein.

65.    At all times relevant to this action, Ms. Shavers was a participant of the group Long-Term Disability Policy No. GP-062399 ("the Plan") underwritten by Aetna and issued to UBS Financial Services, Inc., within the meaning of 29 U.S. C. §1002(7), and was eligible to receive disability benefits under the Plan.

66.    As more fully described above, the termination and refusal to pay Ms. Shavers' benefits under the Plan for the period from at least March 1, 2017 through the present constitutes a breach of Defendant's obligations under the Plan and ERISA.  The decision to terminate benefits to Ms. Shavers constitutes an abuse of

discretion as the decision was not reasonable and it was not based on substantial evidence.

67.     Ms. Shavers brings this action to recover benefits due to her and to enforce her rights under the Plan pursuant to 29 U.S.C. §1132(a)(1)(B).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays the Court to enter judgment for Plaintiff and otherwise enter an Order providing that:

1.     The applicable standard of review in this case is *de novo*.

2.     That the Court may take and review the records of Defendants and any other evidence that it deems necessary to conduct an adequate *de novo* review;

3.     That Ms. Shavers met and continues to meet the Policy's definition of disabled;

4.     Defendant shall pay Ms. Shavers all properly owed past due benefits in accordance with the policy;

5.     Defendant shall pay to Plaintiff such prejudgment interest as allowed by law;

6.     Defendant shall pay Plaintiff's costs of litigation and any and all other reasonable costs and damages permitted by law;

7.     Defendants shall pay attorney's fees for Plaintiff's counsel;

8.     Plaintiff shall receive such further relief against Defendant as the Court deems lawful, just and proper.

Respectfully Submitted,

/s/ Peter H. Burke_____
Peter H. Burke (ASB-1992-K74P)

BURKE HARVEY, LLC
3535 Grandview Parkway
Suite 100
Birmingham, Alabama 35243
Phone:  205-930-9091
Fax:   205-930-9054
pburke@burkeharvey.com

*Attorney for Plaintiff Tammy Shavers*

**PLEASE SERVE DEFENDANTS BY CERTIFIED MAIL AT:**

Aetna Life Insurance Company
151 Farmington Ave, RT 21
Hartford, CT  06156